**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**PARKERSBURG DIVISION**

| | |
|---|---|
| ELIZABETH SIMMONS,<br><br>Plaintiff,<br><br>v.<br><br>EIDP, INC., f/k/a E.I. DU PONT DE NEMOURS AND COMPANY,<br>A Delaware corporation;<br>THE CHEMOURS COMPANY,<br>A Delaware corporation;<br>DUPONT DE NEMOURS, INC.;<br>A Delaware Corporation; and<br>CORTEVA, INC., a Delaware corporation,<br><br>Defendants. | Civil Action No. 2:26-cv-00655<br><br>Judge ___________________<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Elizabeth Simmons, by counsel, for her Complaint against Defendants EIDP, Inc., f/k/a E.I. du Pont de Nemours and Company ("DuPont"); The Chemours Company ("Chemours"); DuPont de Nemours, Inc ("New DuPont") and Corteva, Inc. ("Corteva," but referred to collectively with DuPont, Chemours, and New DuPont as "Defendants"), alleges as follows:

## NATURE OF THE CASE

1. This is a civil action for compensatory and punitive damages brought by Plaintiff Elizabeth Simmons ("Plaintiff"), who was injured as a result of the intentional, malicious, knowing, reckless, and/or negligent acts and omissions of Defendants in connection with the contamination of human drinking water supplies used by Plaintiff with ammonium perfluorooctanoate and/or perfluorooctanoic acid (collectively, "C-8").

2. At all relevant times, DuPont owned, operated, maintained, managed, and/or otherwise controlled a manufacturing facility in Wood County, West Virginia, known as the "Washington Works Plant" (the "Plant"), and The Chemours Company has, since its 2015 separation from DuPont, owned and/or operated the Plant and assumed liabilities arising from DuPont's historical use and release of C-8. For their part, and upon information and belief, New DuPont and Corteva share in a portion of legacy C-8 liabilities pursuant to a multi-party cost-sharing and funding agreements.

3. As a direct and proximate result of Defendants' conduct, Plaintiff ingested C-8-contaminated drinking water.

4. Plaintiff was diagnosed with kidney cancer, a C-8 Science Panel "Linked Disease," which have caused physical pain, mental anguish, diminished enjoyment of life, and the need for lifelong medical treatment and monitoring.

**JURISDICTION AND VENUE**

5. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because Plaintiff is a citizen of a state different from the state of incorporation and principal place of business of each Defendant.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including the operation of the Plant and the releases of C-8 from the Plant in Wood County, West Virginia. Assignment to the Parkersburg Division is proper because the Plant is located in Wood County, West Virginia, and Plaintiff's exposure occurred in Wood County, West Virginia.

7. This Court has personal jurisdiction over Defendants because each Defendant transacts business in West Virginia, owned and/or operated the Plant in West Virginia, committed the tortious acts and omissions alleged herein in West Virginia, and/or assumed DuPont's legacy C-8 liabilities concerning the same.

## PARTIES

### Plaintiff

8. Plaintiff Elizabeth Jean Simmons is a citizen of the United States and a resident and citizen of the State of West Virginia, residing at 3030 Lost Pavement Road, Parkersburg, West Virginia 26101.

9. Plaintiff was born on March 1, 1948.

10. From 1970 to 1974, Plaintiff worked at the Woodmar plant in Wood County for the Marbon Chemical Company and the Marbon Chemical Division of Borg Warner Corp. at its offices located adjacent to and in close proximity to the Plant.

11. From 1974 to 1997, Plaintiff worked at the United Bank Building for Borg Warner Corp and General Electric in Parkersburg, West Virginia. But over that period of time, she occasionally returned to the Woodmar plant to perform assigned work tasks.

12. From 1997 to 2000, Plaintiff worked at the testing lab at Application Development Center for General Electric.

13. From approximately 2000 to 2007, Plaintiff worked at the same Woodmar plant in Wood County for General Electric at its offices located adjacent to and in close proximity to the Plant.

14. From 2007 to 2010, Plaintiff worked at the same Woodmar plant in Wood County for the SABIC (The Saudi Basic Industries Corporation) at its offices located adjacent to and in close proximity to the Plant.

15. As a result of residing in Wood County, West Virginia, and working in close proximity to the Plant, as alleged above, Plaintiff was exposed to dangerous and harmful amounts of C-8.

16. As a result of Defendants' acts and omissions, Plaintiff had kidney cancer, which was first diagnosed in November of 2025. One of Plaintiff's kidneys was thereafter removed in July of 2026. Prior to her cancer diagnosis in November of 2025, Plaintiff had no illness or medical condition or other indication that would have provided notice to her that C-8 exposure had caused her any illness or medical condition.

**Defendants**

17. DuPont is a Delaware corporation with its principal place of business at Chestnut Run Plaza, Buldg. 730, 974 Centre Road, Wilmington, Delaware 19805. DuPont has transacted and conducted business in West Virginia, derived substantial revenue from goods and products used in West Virginia, and owned and operated the Plant during the period of Plaintiff's exposure.

18. Chemours is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19801. In 2015, DuPont spun off its performance chemicals business, including the Plant and associated C-8 liabilities, into Chemours. Chemours transacts and conducts business in West Virginia and is liable for the acts and omissions of DuPont alleged herein to the extent it assumed such liabilities, in addition to its own conduct.

19. New DuPont is a Delaware corporation with its principal place of business at Chestnut Run Plaza, Buldg. 730, 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, New DuPont assumed some or all DuPont legacy C-8 liabilities pursuant to a multi-party cost-sharing and funding agreements.

20. Corteva is a Delaware corporation with its principal place of business at 9330 Zionsville Road, Indianapolis, IN 46268. Corteva is chemical company that spun off from the merger of Dupont and Dow, and upon information and belief shares in a portion of legacy C-8 liabilities pursuant to a multi-party cost-sharing and funding agreements.

21. DuPont, Chemours, New Dupont, and Corteva are referred to collectively herein as "Defendants."

## FACTUAL ALLEGATIONS

### A. DuPont's Use and Release of C-8 at the Washington Works Plant

22. Since the early 1950s, in connection with its manufacturing operations at the Plant, DuPont used one or more materials that contain, incorporate, include, and/or degrade into C-8.

23. During the course of its operations at the Plant, DuPont negligently, recklessly, maliciously, knowingly, carelessly, wrongfully, and/or intentionally allowed, caused, and/or otherwise permitted C-8 to be discharged, vented, emitted, and/or otherwise released from the Plant into the air, soil, sediment, and water at, under, and surrounding the Plant, resulting in C-8 contamination of human drinking water supplies (the "Releases").

24. Since the construction of its manufacturing operations at the Plant, DuPont was aware that one or more operations and equipment involving C-8 would allow and/or permit Releases, yet conducted such operations without adequate control and/or abatement equipment.

25. DuPont also disposed of C-8-containing wastes in unlined landfills in the vicinity of the Plant, including the Dry Run Landfill in Wood County, West Virginia, and the Letart Landfill in Mason County, West Virginia, from which C-8 migrated into groundwater and private water wells.

**B. DuPont's Knowledge of C-8 Toxicity**

26. By at least 1961, DuPont's own researchers had concluded that C-8 was toxic and, according to DuPont's Toxicology Section Chief, should be "handled with extreme care."

27. By 1978, 3M Company, DuPont's C-8 supplier at the time, informed DuPont's Medical Director that blood samples collected from 3M workers exposed to C-8 contained organic fluorine.

28. In 1978, DuPont's Medical Director published an article acknowledging that DuPont had a "duty to report health hazards" and "should disclose health-hazard information."

29. By March 1979, DuPont possessed data suggesting that its workers exposed to C-8 had a significantly higher incidence of adverse health problems, including abnormal liver function tests, as compared to unexposed workers, yet DuPont failed to report those results to any government agency or community near its facilities.

30. By 1980, DuPont had confirmed internally that C-8 "is toxic," that "people accumulate C-8," and that "continued exposure is not tolerable."

31. In 1981, after learning of eye defects in the offspring of laboratory rats exposed to C-8, DuPont studied the pregnancies of its own female Plant employees and found that two of seven babies born to C-8-exposed employees had eye and/or facial defects and elevated blood levels of C-8, demonstrating that C-8 crosses the placenta. DuPont chose not to finalize, publish, or disclose those results outside the company.

32. In November 1982, DuPont's Medical Director noted that C-8 "is retained in the blood for a long time," that there was "obviously great potential for current or future exposure of members of the local community from emissions" from the Plant, and recommended that all "available practical steps be taken to reduce this exposure."

33. By 1984, DuPont began secretly collecting tap water samples from public water supplies near the Plant and detected C-8 in public water sources in both Ohio and West Virginia.

34. At a 1984 meeting at its Wilmington, Delaware headquarters, DuPont personnel described the C-8 issue as "one of corporate image, and corporate liability," acknowledged that DuPont was "already liable for the past 32 years of operation," deemed options to eliminate C-8 emissions not "economically attractive," and decided not only to continue using C-8 but to increase its use at the Plant, in part because discontinuing C-8 would have jeopardized approximately $100–$200 million in annual business.

35. As late as 1988, DuPont was aware that at least one toxicity study in laboratory rats revealed a relationship between C-8 exposure and increased rates of certain cancers, including testicular cancer.

36. Rather than disclose to the Lubeck Public Service District ("LPSD") or its customers that elevated C-8 levels had been detected in the LPSD water supply, DuPont purchased the LPSD well-field property and, in 1989, facilitated the LPSD's relocation further from the Plant, after which DuPont directed employees to cease sampling the former LPSD wells and to destroy previously drawn but unanalyzed samples.

37. In 1991, DuPont adopted an internal Community Exposure Guideline ("CEG") for C-8 in community drinking water of 1 part per billion ("ppb"). Later that year, DuPont's analyses detected C-8 in public water supplies near the Plant well above 1 ppb, including levels as high as 3.9 ppb at the new LPSD well field. DuPont prepared information to disclose those facts to affected residents but chose not to release it.

38. Instead, in November 1991, DuPont switched to an outside laboratory whose method recovered only approximately 60% of the C-8 actually present in water, and DuPont thereafter failed to correct or clarify the resulting artificially low results when it disclosed data to water suppliers, their customers, and government agencies.

39. Throughout the 1990s, DuPont's corporate epidemiologists internally tracked increased levels of various cancers, including prostate and kidney cancer, among Plant employees, but DuPont chose not to publish or disclose those results.

40. By at least May 2000, DuPont learned that 3M had decided to stop manufacturing C-8 because of concerns about its bio-persistence and toxicity. Nevertheless, DuPont's top corporate management decided in 2000 not to stop using or releasing C-8, and later commenced its own manufacture of C-8.

41. In 2001, DuPont's own in-house counsel acknowledged in writing that "we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

**C. DuPont's Misrepresentations to the Public**

42. Between late 2001 and 2003, DuPont orchestrated efforts through a "C-8 Assessment of Toxicity Team" to generate a drinking water "screening level" of 150 ppb—150 times higher than DuPont's own 1 ppb CEG—which DuPont then repeatedly held out to the public, including Plaintiff, as proof that local C-8 levels were "safe."

43. From 2002 through at least 2009, DuPont, through its executives, laboratory directors, plant managers, spokespersons, and consultants, repeatedly and falsely represented to the public, including Plaintiff, that there were "no known adverse human health effects" associated with C-8, that C-8 "is not a human health issue," that C-8 "is not hazardous to human health," and that C-8 in local drinking water was "safe."

44. In 2004, the United States Environmental Protection Agency ("USEPA") filed an administrative complaint against DuPont for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act arising from DuPont's failure to disclose C-8 toxicity and exposure information, which DuPont settled for over $16 million in civil administrative penalties and supplemental environmental projects.

45. In January 2006, USEPA's Science Advisory Board approved its PFOA Review Panel's recommendation that C-8 be classified as a "likely" human carcinogen. In February 2006, DuPont's own Epidemiology Review Board cautioned DuPont to stop publicly asserting that C-8

has no adverse health effects. DuPont disregarded that advice and continued to make such statements.

46. At no time since C-8 was first detected in Plaintiff's drinking water did Defendants disclose to the public, including Plaintiff, that C-8 was present in that water at levels presenting a risk of harm or injury.

47. Defendants did not seek, and Plaintiff did not give permission to put any amount of C-8 into Plaintiff's drinking water or into Plaintiff's blood, serum, and/or body.

**D. Properties of C-8**

48. C-8 is bioretentive, bioaccumulative, and biopersistent; it is retained and accumulates in the blood and tissues of exposed humans and persists in the environment. C-8 is a hazardous substance, toxin, pollutant, and contaminant that poses a risk to human health at concentrations of less than 1 ppb in water.

**E. The Leach Class Action, the C-8 Science Panel, and Plaintiff's Claims**

49. In 2001, a class action arising from C-8 contamination of drinking water near the Plant was filed in West Virginia state court, styled *Leach, et al. v. E. I. du Pont de Nemours and Co.*, Civil Action No. 01-C-608 (Cir. Ct. Wood Cty., W. Va.) (the "Leach Case").

50. In 2004, DuPont entered into a Class Action Settlement Agreement in the Leach Case, which was approved by the court in 2005 (the "Leach Settlement"). Under the Leach Settlement, the individual personal injury claims of class members were preserved pending a determination by an independent C-8 Science Panel of whether a "Probable Link" exists between C-8 exposure and any human disease.

51. The C-8 Science Panel ultimately found a Probable Link between C-8 exposure and six diseases: (1) kidney cancer; (2) testicular cancer; (3) ulcerative colitis; (4) thyroid disease; (5) pregnancy-induced hypertension/preeclampsia; and (6) medically diagnosed high cholesterol (the "Linked Diseases"). The last of the Science Panel's reports was released in October 2012.

52. Under the Leach Settlement, DuPont agreed that, for individual personal injury claims of Leach Class Members involving a Linked Disease, it will not contest general causation—that is, whether exposure to C-8 is capable of causing that Linked Disease.

53. Leach Class Members include individuals who consumed, for at least one year prior to December 3, 2004, C-8-contaminated drinking water from one or more water sources specified in the Leach Settlement and who did not opt out of the Leach Settlement.

54. Plaintiff is a Leach Class Member and suffers from a Linked Disease, having been diagnosed with kidney cancer in November of 2025.

55. The Releases have made Plaintiff physically ill and otherwise physically harmed, and have caused and continue to cause associated emotional and mental distress, anxiety, and fear of current and future illness, including fear of recurrence of cancer.

**F. Timeliness of Plaintiff's Claims**

56. Plaintiff's claims are timely. Under the Leach Settlement, the running of any statute of limitations applicable to Leach Class Members' personal injury claims involving a Linked Disease was tolled from August 30, 2001, through January 28, 2013.

57. Plaintiff's claims are further governed by the federally required commencement date under 42 U.S.C. § 9658, which preempts any earlier accrual date under state law for personal

injury claims caused by exposure to a hazardous substance released into the environment from a facility. Plaintiff did not know, and could not reasonably have known, that her injuries were caused or contributed to by C-8 until November of 2025, fewer than two years before the filing of this Complaint.

58. Plaintiff's claims are also tolled by West Virginia's discovery rule and by Defendants' fraudulent concealment of the presence and health risks of C-8, as alleged herein.

**COUNT I — NEGLIGENCE**

59. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully restated herein.

60. Defendants owed Plaintiff a duty to exercise reasonable care in the ownership, operation, maintenance, management, and control of the Plant, including a duty to ensure that the Plant would not create a condition causing harm to persons or the environment, commensurate with the inherently dangerous nature of C-8.

61. By affirmatively representing that the Releases were not causing harm and that the contaminated drinking water was safe to consume, Defendants also voluntarily assumed a duty to Plaintiff and the public to make such representations accurately and completely.

62. Defendants breached their duties by, among other things: (a) causing, permitting, and failing to minimize, abate, or treat the Releases; (b) failing to install available control technologies, such as stack scrubbers and carbon adsorption treatment systems, for decades; (c) failing to notify the public and government officials of the Releases and of C-8 levels exceeding

DuPont's own CEG; and (d) failing to correct, clarify, or rescind their representations that the Releases were harmless and the water was safe.

63. Defendants knew or should have known that Plaintiff would foreseeably be injured by their failure to exercise reasonable care. But for Defendants' negligence, Plaintiff would not have been exposed to, or would not have continued to consume, C-8-contaminated drinking water.

64. As a direct and proximate result of the foregoing, Plaintiff suffered serious and permanent injuries, including kidney cancer, physical pain and mental anguish, diminished enjoyment of life, fear of recurrence, past and future medical, health, and related expenses, and the need for lifelong medical treatment, monitoring, and/or medications.

**COUNT II — FRAUDULENT CONCEALMENT AND MISREPRESENTATION**

65. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully restated herein.

66. Defendants possessed superior knowledge of at least the following: (a) the Releases; (b) the presence of C-8 in area drinking water at unsafe levels grossly exceeding DuPont’s own CEG; (c) the fact that Defendants’ own employees, as well as the public (and even their children while in utero) had, in fact, been exposed to C-8 and carried C-8 in their bloodstreams; (d) the potential adverse health consequences of C-8 exposure at the levels caused by Defendants; (e) the fact that at least some exposed individuals were injured as a result of their C-8 exposure through, among other ailments, kidney cancer. Defendants had a duty to disclose that information to the public.

67. Defendants knowingly, intentionally, maliciously, and/or recklessly withheld, concealed, and misrepresented that information, and affirmatively represented that C-8 exposure was harmless. Indeed, Plaintiff effectuated these representations through at least the following ways, as well as others as discovery may reveal:

a. In or around 1989, purchasing the LPSD's well-field property, facilitating its relocation further away from the Plant, and directing employees to cease sampling the former LPSD wells and destroy previously drawn samples, all in an attempt to conceal the extent of C-8 contamination on drinking water supplies;

b. In or around November 1991, switching to an outside laboratory to test for C-8 in water supplies, but opting for a laboratory whose method detected only 60% of the C-8 actually present in water, thereby artificially lowering the detected C-8 levels. Defendants compounded this deceitful measure by disclosing this manipulated data to water suppliers, their customers, and government agencies;

c. Between late 2001 and 2003, orchestrating efforts to misinform the public through its "C-8 Assessment of Toxicity Team" that local C-8 levels were safe; and

d. From 2002 through at least 2009, repeatedly spreading numerous false statements through its executives, laboratory directors, plant managers, spokespersons, and consultants, that C-8 exposure was "not a human health issue," that C-8 "is not hazardous to human health," that C-8 in local drinking water was "safe," and that there were "no known adverse human health effects" associated with C-8, even though Defendants knew that each of the statements were and continue to be false.

68. Defendants knowingly concealed and misrepresented these facts with the intent that Plaintiff and the public would rely on those known misrepresentations and continue to consume the contaminated drinking water to their peril without seeking relief regarding the same from Defendants.

69. Plaintiff did not and could not possess sufficient information to determine the safety of the drinking water due to Defendants' efforts to conceal the same, and she justifiably relied on

Defendants' misrepresentations and omissions by continuing to consume the contaminated water and by failing to seek earlier medical evaluation.

70. As a direct and proximate result of the foregoing, Plaintiff suffered serious and permanent injuries, including kidney cancer, physical pain and mental anguish, diminished enjoyment of life, fear of recurrence, past and future medical, health, and related expenses, and the need for lifelong medical treatment, monitoring, and/or medications.

**COUNT III — STRICT LIABILITY FOR ABNORMALLY DANGEROUS ACTIVITY**

71. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully restated herein.

72. Defendants' use, discharge, and disposal of C-8 at and from the Plant constituted an abnormally dangerous activity, in that it created a high degree of risk of serious harm to persons, the risk could not be eliminated by the exercise of reasonable care, the activity was not a matter of common usage, it was inappropriate to the densely populated area in which it was carried on, and its dangers outweighed its value to the community.

73. The harm suffered by Plaintiff is the kind of harm the possibility of which made Defendants' activity abnormally dangerous, and Defendants are therefore strictly liable to Plaintiff.

74. As a direct and proximate result of the foregoing, Plaintiff suffered serious and permanent injuries, including kidney cancer, physical pain and mental anguish, diminished enjoyment of life, fear of recurrence, past and future medical, health, and related expenses, and the need for lifelong medical treatment, monitoring, and/or medications.

**COUNT IV — NEGLIGENCE PER SE**

75. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully restated herein.

76. West Virginia and federal statutes and regulations, including but not limited to the West Virginia Water Pollution Control Act, W. Va. Code § 22-11-1 et seq., and the reporting requirements of the Toxic Substances Control Act, 15 U.S.C. § 2607, impose duties on Defendants designed to protect persons such as Plaintiff from the type of harm she suffered.

77. Defendants violated those statutes by, among other things, causing the Releases and failing to report C-8 toxicity and exposure information, and such violations constitute negligence per se.

78. As a direct and proximate result of the foregoing, Plaintiff suffered serious and permanent injuries, including kidney cancer, physical pain and mental anguish, diminished enjoyment of life, fear of recurrence, past and future medical, health, and related expenses, and the need for lifelong medical treatment, monitoring, and/or medications.

**COUNT V — TRESPASS AND BATTERY**

79. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully restated herein.

80. Defendants knew that the Releases were contaminating active drinking water sources, including Plaintiff's, with C-8, which they knew to be toxic and to remain in the human body for an extended period, and continued the Releases with knowledge that harmful contact with Plaintiff's body was substantially certain to result.

81. The invasion and continued presence of C-8 in Plaintiff's blood and body was without Plaintiff's consent or authorization, is offensive and harmful, and constitutes a continuing trespass and battery.

82. As a direct and proximate result of the foregoing, Plaintiff suffered serious and permanent injuries, including kidney cancer, physical pain and mental anguish, diminished enjoyment of life, fear of recurrence, past and future medical, health, and related expenses, and the need for lifelong medical treatment, monitoring, and/or medications.

**COUNT VI — PUNITIVE DAMAGES**

83. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully restated herein.

84. Defendants' acts and omissions, including their decades-long concealment of C-8's presence and toxicity and their decision to increase C-8 use and emissions for economic reasons despite known risks, were carried out with actual malice and/or a conscious, reckless, and outrageous indifference to the health, safety, and welfare of Plaintiff and others, within the meaning of W. Va. Code § 55-7-29, such that Defendants are liable for punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Elizabeth Jean Simmons demands judgment against Defendants, jointly and severally, as follows:

A. Compensatory damages for past and future pain and suffering, mental anguish, loss of enjoyment of life, and fear of recurrence, in an amount to be determined by the jury;

B. Past and future medical, health care, and related expenses;

C. Punitive damages in an amount sufficient to punish Defendants and deter similar conduct;

D. Pre-judgment and post-judgment interest as permitted by law;

E. The costs of this action and reasonable attorneys' fees as permitted by law; and

F. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Dated: October 12, 2026.

Respectfully submitted,

ELIZABETH JEAN SIMMONS,

By Counsel

*/s/ Robert S. Pruett*

J. David Fenwick (WVSB #6029)
Robert S. Pruett (WVSB #12683)
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
304-346-7000
jdf@goodwingoodwin.com
rsp@goodwingoodwin.com